UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARRON LAROCQUE,

    Plaintiff,

                                              Civil No. 04-74861
                                              Hon. John Feikens

    v.

CITY OF EASTPOINTE,

    Defendant.

_____/

**OPINION AND ORDER**

Plaintiff brings suit under Title VII, 42 U.S.C. § 2000e, *et seq.*, and Michigan's Elliott-Larsen Act, M.C.L. § 37.2101, *et seq.*, alleging hostile work environment sex discrimination and unlawful retaliation by her former employer. Defendant's motion for summary judgment is GRANTED as to Plaintiff's Title VII claims, and jurisdiction is declined over the remaining state law claims.

I.     **FACTUAL BACKGROUND**

In March 1999, Plaintiff was hired by the City of Eastpointe as a part-time, civilian code enforcement officer with the Eastpointe Police Department (the "Department"). (Pl.'s Resp. 1; Def.'s Mot. Ex. A.) Plaintiff had an "at-will" employment relationship with the City, meaning she could be terminated at any time with or without cause or notice. (Def.'s Mot. Ex. A; Pl. Dep. 125-28.) Plaintiff's employment with the Department was terminated by Chief Lauretti on July 19, 2004. (Pl.'s Resp. 1; Def.'s Mot. Ex. P.) Plaintiff claims she was discharged in retaliation for the sexual harassment complaints she made to the Department about a fellow officer.

Defendant alleges that Plaintiff was terminated because she made false statements in connection with those sexual harassment complaints, in violation of departmental policy.

**A.     The Hallway Incident**

In her response brief, Plaintiff identifies two incidents of alleged sexual harassment.[1] The first incident occurred on or about October 2, 2003 when Plaintiff overheard comments made by Officer Hill to Officer Lamm in the police department hallway.  (Pl.'s Resp. 6; Def.'s Br. 1, Ex. F.)  She overheard Hill tell Lamm that Plaintiff was mad at Lamm "because she wants to have sex with you," and that Lamm should "take her out" and "do her" or "hump her like at the Christmas party."  (Pl.'s Resp. 7; Pl. Dep. 230-32; Def.'s Mot. Ex. F.)  Plaintiff was upset by Hill's remarks, so she told Lieutenant Zavislak she was ill and went home early.  (Pl. Dep. 232-34.)  She returned to work the following Monday and reported the incident to her supervisor, Corporal Przywara.  (Pl. Dep. 363-66.)

**B.     The Parking Lot Incident**

Plaintiff asserts that the second incident of harassment occurred during a meeting between Plaintiff and Hill in the police station parking lot.  (Pl.'s Resp. 7-8; Pl. Dep. 371-72.)  She testified that the incident occurred in early November 2003.  (Pl. Dep. 371-72.)  Plaintiff and Hill remained in their respective vehicles during the meeting.  (Pl. Dep. 376.)  Plaintiff said Hill told her he thought she and Lamm had been in a sexual relationship, that Plaintiff was angry at

---

[1] Defendant's brief mentions an additional encounter between Plaintiff and Officer Hill. (Def.'s Br. 2.)  Plaintiff asserts that in late November 2003, Hill walked up behind her while she was working in the report room and asked her if she was afraid.  (Pl. Dep. 421-25.)  Plaintiff thinks she told him she was not afraid.  Id.  Plaintiff testified that Hill did not say anything sexual during that conversation, nor did he say anything about Officer Lamm.  Id.
    Plaintiff's brief does not identify this encounter as an incident of sexual harassment, and thus it will not be considered as such.  (See Pl.'s Resp. 2.)

Lamm and "wanted to get back sexually with him," and that she was trying to use her relationship with Lamm to "destroy his career" and "fuck up his life." (Pl.'s Resp. 8, Ex. C; Pl. Dep. 380-84.) Hill allegedly told Plaintiff that nobody in the Department would talk to her because she was trying to "fuck up an officer and end his career," and that Lamm would not resume the relationship with Plaintiff because she "was sleeping with everybody else in here." Id. Plaintiff testified that Hill accused her of trying to cause trouble for Lamm by complaining about him to supervisors, and that Hill told her to "stay away from the supervisors" and "to keep [her] sexual relationship with [Lamm] outside of the job." Id. Plaintiff reported the parking lot incident to Corporal Genter. (Pl. Dep. 256.)

**C.      Defendant's Investigation of Plaintiff's Sexual Harassment Complaints**

On December 4, 2003, Chief Danbert called a meeting with Inspector Lauretti, Sergeant Bourgeois, and Plaintiff. (Def.'s Mot. Ex. E.) Danbert asked Plaintiff to describe verbally her allegations of harassment and to put her complaint in writing. (Def.'s Mot. Ex. E.) Danbert assigned Bourgeois to conduct an investigation of Plaintiff's allegations and assigned Lieutenant Zavislak to oversee the investigation and recommend corrective action. Id. Bourgeois testified that he had no prior experience conducting internal personnel investigations and was given no direction on how to conduct the investigation. (Bourgeois Dep. 13-14.)

Bourgeois and Zavislak (collectively the "investigating officers") each prepared written reports of their investigation. (Def.'s Mot. Ex. M.) Bourgeois's report indicates that he reviewed Plaintiff's written complaint, as well as the daily time sheets and log sheets for Plaintiff and Hill. (Def.'s Mot. Exs. K, M.) Plaintiff's written complaint describes the hallway incident and the parking lot incident. (Def.'s Mot. Ex. F.) She wrote that the parking lot incident

3

occurred around December 1; she did not mention any other meetings with Hill in the parking lot. Id. The log sheets showed that Hill met with Plaintiff for 35 minutes on November 24, 2003; the meeting was recorded on Hill's in-car audio/video recording system. (Def.'s Mot. Exs. G, H, M.) The investigating officers reviewed the November 24 videotape, which showed a 38-minute meeting between Plaintiff and Hill in the police station parking lot. (Def.'s Mot. Ex. M.) They identified the meeting as the one Plaintiff had described in her written complaint, because it contained certain "marker points" she had mentioned. Id. However, they determined that the videotape contradicted Plaintiff's account of the incident, because Hill made no statements of a sexual nature during the meeting.[2] Id.

The investigating officers interviewed Plaintiff on December 11, 2003.[3] (Def.'s Mot. Ex. M.) Their reports indicate that she verbally reiterated the content of her written complaint, although she was uncertain about the dates of the incidents. Id. The investigating officers played the November 24 videotape from Hill's vehicle for Plaintiff; she was unable to explain the inconsistency between the videotape and her written complaint. Id. Bourgeois's report indicates that both before and after the tape was played, Plaintiff said she had only one meeting

---

[2] Defendant's Exhibit H includes a copy of the videotape and a purported transcript of the videotape. Plaintiff objects to the inclusion of the transcript, because it is not certified, signed, dated, or authenticated in any way. This Court may rely only on admissible evidence in deciding Defendant's motion, and thus the transcript will not be considered. See Neason v. GMC, 409 F. Supp. 2d 873, 875 n.1 (E.D. Mich. 2005).
Plaintiff does not contest the authenticity of the videotape submitted as part of Exhibit H and concedes in her response brief that Defendant relied upon this tape in its investigation of her allegations against Hill. (Pl.'s Resp. 13.) This Court has viewed the videotape and can confirm Defendant's account of its content.

[3] Plaintiff objects to Defendant's Exhibit I, an alleged transcript of that interview, for the same reasons as the transcript in Exhibit H. Exhibit I will not be considered in deciding Defendant's motion, see supra note 2.

with Hill in the parking lot.  Id.  He wrote that "[Plaintiff] agrees that the tape she watched and heard was the only conversation she and Ofc. Hill ever had."  Id.

On December 16, 2003, Plaintiff asked to meet with the investigating officers.[4]  (Def.'s Mot. Ex. M.)  Their reports state that she told them about a second meeting with Hill in the parking lot in early November, prior to the November 24 meeting that was videotaped.  Id.  She said she confused the two meetings because both had occurred in the same location, and she had been under pressure and unable to think.  Id.  Plaintiff testified in her deposition that she had two parking lot meetings with Hill and that the harassment occurred at the first meeting in early November.  (Pl.'s Dep. 371-72, 380-84.)

After the December 16 meeting with Plaintiff, Bourgeois reviewed each of the videotapes from Hill's vehicle for October and November 2003 and found no record of a second meeting with Plaintiff in the station parking lot.  (Def.'s Mot. Exs. K, M.)  In his deposition, Chief Lauretti testified that officers had physical control over the operation of the in-car audio/video recording system; they could turn the system on and off.  (Lauretti Dep. 87-88.)  He testified that, as of 2005, the Department's policy required officers to keep the recording system on at all times; prior to 2005, the Department only required the system to be on when officers took certain actions.  Id.

The reports of Bourgeois and Zavislak show that they interviewed seven police witnesses (including Hill, Lamm, Genter, and Przywara) and three civilians.  (Def.'s Mot. Ex. M.)  Hill told Bourgeois he had met with Plaintiff only once in the parking lot, on November 24.  Id.  Hill

---

[4] Defendant's Exhibit Q, an alleged transcript of that meeting, is inadmissible for the same reason as Exhibit I, see supra note 3.

said he never made any sexual remarks to Plaintiff.  Id.  Zavislak found that Plaintiff reported the hallway incident to Przywara around the first week in October 2003.  Id.  He found that it was unclear whether Przywara acted on Plaintiff's complaint, because Przywara did not remember and there was no documentation of any action.  Id.  Zavislak also found that Plaintiff reported the parking lot incident to Genter, who said he took no action because Plaintiff asked him not to.  Id.  Zavislak concluded that "[t]here were mistakes made in handling the initial complaint," such as Przywara's and Genter's failure to document and investigate Plaintiff's concerns.  Id.

Both Zavislak's and Bourgeois's reports concluded that they could neither prove nor disprove Plaintiff's allegations regarding the hallway incident.  (Def.'s Mot. Ex. M.)  However, they concluded that her account of the parking lot incident was unfounded based on the videotape evidence and the fact that she had remembered a second meeting with Hill only after being shown the November 24 videotape that contradicted her allegations.  Id.

**D.      Plaintiff's Termination**

Chief Lauretti testified that he viewed the November 24 videotape from Hill's vehicle, that he had seen Plaintiff's written complaint of harassment and a statement by Hill, and that he reviewed the reports by Bourgeois and Zavislak.  (Lauretti Dep. 21-23.)  He never met with Hill regarding Plaintiff's allegations, because his "purpose is not to investigate, but to review."  (Lauretti Dep. 56.)

Plaintiff received a written "Notice of Pending Charges of Misconduct," dated July 12, 2004, and signed by Lauretti.  (Pl.'s Resp. Ex. G.)  The Notice advised Plaintiff that she had on multiple occasions violated departmental policy "by making false verbal and written reports about a conversation you had with Officer Ricky Hill on November 24, 2003."  Id.  The Notice

provided six examples of allegedly false statements made by Plaintiff during the course of Defendant's investigation into her sexual harassment allegations. Id. The Notice stated that Plaintiff's conduct had violated five of the "Eastpointe Police Department Policies and Procedures and Work Rules and Regulations" pertaining to employee conduct, integrity, and truthfulness.[5] Id.

On July 15, 2004, a hearing was held on Plaintiff's charges of misconduct, at which Plaintiff, Lauretti, and City Manager O'Neil were present.[6] (Pl.'s Resp. 12.) Plaintiff submitted a letter in response to her charges, dated July 13, 2004, in which she maintained that her complaints to the Department were made in good faith. (Pl.'s Resp. Ex. I.) She wrote, "Some information such as dates, times, and locations, may be off somewhat, but all facts are true. There were other issues going on which was most stressful to me at that time which made some information uncertain to me during the investigation." Id.

Plaintiff's employment with the Department was terminated by a letter from Chief Lauretti, dated July 19, 2004. (Pl.'s Resp. Ex. J.) The letter states that "[a]fter considering all

---

[5] 1. Conduct: An Officer must, at all times, whether on or off duty conduct themselves in a manner which does not bring discredit to himself or the Department or the City.
2. Discipline: Any member who violates any Rule/Regulation policy procedure or whose conduct discredits the Department or impairs its effective operation may be subject to discipline, up to and including discharge.
3. Integrity: An Officer must, scrupulously avoid any conduct, which might compromise the integrity of himself or his fellow Officers of the Department.
4. Reports and Bookings: No member or employee shall knowingly falsify any official report, or enter or cause to be entered any inaccurate false or improper information in the records of the Department.
5. Truthfulness: A member must speak the truth at all times, and under all circumstances. (Pl.'s Resp. Ex. G.)

[6] Defendant's Exhibit O is inadmissible for the same reason as Exhibit I, see supra note 3.

7

evidence presented in this matter," the charges against Plaintiff "are in fact substantiated." Id. Lauretti testified that Plaintiff "was terminated for the untruthfulness act of the rules and regulations policy." (Lauretti Dep. 59.)

## II. ANALYSIS

### A. Summary Judgment Standard of Review

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and any inferences drawn therefrom in a light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movant's burden is satisfied where there is an absence of evidence to support the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### B. Title VII Sex Discrimination

A plaintiff must prove five elements to establish a prima facie case of hostile work environment based on sexual harassment by a co-worker[7]: "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action." Fenton v. HiSAN, Inc., 174 F.3d 827, 829-30 (6th Cir. 1999).

---

[7] Plaintiff has not alleged or presented evidence showing that Officer Hill was her supervisor.

8

The hostile work environment inquiry has both objective and subjective components. Williams v. GMC, 187 F.3d 553, 568 (6th Cir. 1999). The crux of that inquiry is whether a reasonable person would find the work environment objectively hostile, and whether the plaintiff subjectively found the offending conduct to be "severe or pervasive." Id. A court must take into account the totality of circumstances and consider the cumulative effect of the alleged individual incidents of harassment. Id. at 562-64.

Plaintiff's case fails on the fourth element: the evidence presented shows that the alleged harassment was neither severe nor pervasive. Plaintiff claims she overheard Hill make sexual comments about her to Lamm in the police department hallway. Plaintiff also claims that Hill made accusations and threats to her in the parking lot regarding her alleged sexual relationship with Lamm. Comments like these do not surpass the threshold of objective hostility set by cases such as Burnett v. Tyco Corp., 203 F.3d 980 (6th Cir. 2000) and Black v. Zaring Homes, 104 F.3d 822 (6th Cir. 1997).

**C.      Title VII Retaliation**

To make a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792-93 (6th Cir. 2000). Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for its actions." Id. The

9

plaintiff bears the burden of persuasion and must show that the defendant's reason was merely a pretext for unlawful retaliation. Id.

### 1. *Prima Facie Case of Retaliation*

Defendant argues that Plaintiff has not satisfied the first and fourth elements of the prima facie case. Regarding the first element, Defendant asserts that Plaintiff's internal complaints to the Department about Hill's actions are not "protected activity" under Title VII, because the Department ultimately concluded that her accusations were false. The Sixth Circuit has defined "protected activity" as an employee's opposition to any employment practice "that the employee reasonably believes to be a violation of Title VII." Johnson, 215 F.3d at 579. The substance of Plaintiff's complaints about Hill to various members of the Department, as well as her persistence in the veracity of those complaints during her misconduct hearing, demonstrate that she reasonably believed that Hill had sexually harassed her.

As for the fourth element, Defendant argues that Plaintiff has not shown a causal connection between her internal complaints regarding Hill and her termination by the Department. Causation is established if the plaintiff offers evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997). By Defendant's own admission, Plaintiff's employment was terminated because she made false statements in connection with the Department's investigation of her sexual harassment complaints. (Def.'s Br. 14, Exs. N, P.) Clearly this is sufficient evidence of a causal nexus between Plaintiff's protected activity and Defendant's decision to discharge her.

### 2. *Defendant's Legitimate, Nondiscriminatory Reason*

Defendant has met its burden of production to offer a legitimate, nondiscriminatory reason for Plaintiff's termination. Morris, 201 F.3d at 792-93. Defendant contends that Plaintiff was discharged "for violating departmental rules and regulations regarding conduct, integrity, truthfulness and false report writing," and those violations "arose out of Plaintiff's false verbal and written allegations of sexual harassment." (Def.'s Br. 14.) The Notice of Pending Charges of Misconduct against Plaintiff and Chief Lauretti's letter terminating her employment support Defendant's proffered reason. (See Def.'s Br. Exs. N, P.)

### 3.   *Evidence of Pretext*

The Sixth Circuit has adopted the "honest belief" standard for deciding pretext in the context of retaliation claims. Balmer v. HCA, Inc., 423 F.3d 606, 614 (6th Cir. 2005). To establish pretext, the evidence must show that the employer did not make a "'reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered reason for the adverse employment action." Id. The question is "whether the employer can establish reasonable reliance on the particularized facts that were before the employer when the decision was made." Id.

Plaintiff argues that Defendant's decision was not reasonably informed and considered, because its internal investigation of her complaints and its decision-making process were flawed. (Pl.'s Resp. 18; Pl.'s Supp. Br. 2-3.) However, the Sixth Circuit does not require "that the decisional process used by the employer be optimal or that it left no stone unturned." Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998). In analogous cases where an employer's internal investigation resulted in an employee's termination, the Sixth Circuit found no evidence of pretext where the employer's reliance on the facts before it was reasonable. See Scott v.

11

FirstMerit Corp., 2006 U.S. App. LEXIS 1709 (6th Cir. Jan. 23, 2006); Braithwaite v. Timken Co., 258 F.3d 488 (6th Cir. 2001); Smith, 155 F.3d 799.

The reports by Bourgeois and Zavislak show that they conducted an adequate investigation and reasonably concluded that Plaintiff's account of the parking lot incident was without merit. This conclusion was based in part on the fact that Plaintiff changed her story after being confronted with the November 24 videotape, as well as the lack of video evidence of a second meeting.[8] Chief Lauretti's reliance on their reports and other evidence in deciding to terminate Plaintiff's employment was also reasonable.

### III. CONCLUSION

Defendant's motion is GRANTED as to Plaintiff's Title VII claims, and this Court declines jurisdiction over the remaining state law claims.

**IT IS SO ORDERED.**

Date:     May 4, 2006              s/John Feikens
                                   United States District Judge

> Proof of Service
>
> I hereby certify that the foregoing order was served on the attorneys/parties of record on May 4, 2006, by U.S. first class mail or electronic means.
>
>                          s/Carol Cohron
>                          Case Manager

---

[8] The lack of video evidence does not compel the conclusion that a second meeting never occurred, as Lauretti testified that officers had physical control over their in-car recording systems. The investigating officers also could have given credence to Plaintiff's explanation for why she "remembered" the second meeting only after being shown the videotape. However, the question is not whether their conclusion was correct, but rather was it reasonable given the particularized facts before them. See Balmer, 423 F.3d at 614; Scott, 2006 U.S. App. LEXIS at 9.

12